UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
READ PROPERTY GROUP LLC,

                 Plaintiff,

       -against-                       <u>**MEMORANDUM AND ORDER**</u>
                                            16 CV 4573 (CLP)
HAMILTON INSURANCE COMPANY,
a/k/a HAMILTON SPECIALTY
INSURANCE COMPANY,

                 Defendant.
----------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

       On July 14, 2016, plaintiff Read Property Group LLC ("Read") commenced this action in New York Supreme Court, Kings County, against Hamilton Insurance Company, a/k/a Hamilton Specialty Insurance Company ("Hamilton"), alleging breach of contract and seeking insurance coverage for losses incurred at 3 Oakwood Drive, Parlin, New Jersey (the "Property"). The case was removed to this Court on August 10, 2016, based on diversity of citizenship pursuant to 28 U.S.C. § 1332. The parties have consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636.

       On August 4, 2017, defendant filed a motion for summary judgment; plaintiff filed its cross-motion for summary judgment on September 6, 2017. The Court heard oral argument on March 12, 2018. As explained in detail below, the parties' insurance contract unambiguously excludes coverage for the loss at issue, and the Court therefore grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment.

Plaintiff Read is a limited liability company operating in New York, and having its principal place of business located at 4706 18th Avenue, Brooklyn, New York. (Def.'s 56.1 Stmnt[1] ¶ 8; Pl.'s 56.1 Stmnt[2] ¶ 8). Defendant Hamilton is a corporation incorporated in Bermuda with its principal place of business located at 600 College Road East, Suite 3500, Princeton, New Jersey. (Def.'s 56.1 Stmnt ¶ 9; see also Pl.'s 56.1 Stmnt ¶ 9 (conceding that the insurance policy lists defendant's place of business as New Jersey)). According to defendant, Hamilton is in the business of writing and issuing insurance policies. (Def.'s 56.1 Stmnt ¶ 9).

The parties agree that Hamilton issued a Commercial Property insurance policy to Read, effective from December 4, 2015 through December 4, 2016 (the "Policy"). (Id. ¶ 10; Pl.'s 56.1 Stmnt ¶ 10). The Policy, bearing policy number WKHSPR-00386-01, was to provide coverage to Read for any damages sustained at the Property as well as at 361 other properties. (Def.'s 56.1 Stmnt ¶¶ 10, 12; Pl.'s 56.1 Stmnt ¶¶ 10, 12; see also Lager Decl.,[3] Ex. E). The Declaration page of the Policy identifies the "Business Description" of Read, the named insured, as "Apartment Building Operators." (Def.'s 56.1 Stmnt ¶ 11; Pl.'s 56.1 Stmnt ¶ 11).

On January 14, 2015,[4] plaintiff submitted a Property Loss Notice to defendant, identifying the loss at the Property as "water damage due to bathroom pipe break at the above

---

[1] Citations to "Def.'s 56.1 Stmnt" refer to Defendant's Rule 56.1 Statement of Undisputed Material Facts, dated August 4, 2017, ECF No. 20-2.

[2] Citations to "Pl.'s 56.1 Stmnt" refer to Plaintiff's Local Rule 56.1 Statement, dated September 6, 2017, ECF No. 21-8.

[3] Citations to "Lager Decl." refer to the Declaration of Karen M. Lager, dated August 4, 2017, ECF No. 20-3.

[4] Although defendant's 56.1 Statement indicates that the Property Loss Notice was submitted on January 14, 2015, the Court concludes that this is a typographical error since the loss did not occur until January 2016. (Compare Def.'s 56.1 Stmnt ¶ 13, with id. ¶¶ 14, 15, 16 and Lager Decl., Ex. F).

location" that occurred on January 9, 2016. (Def.'s 56.1 Stmnt ¶ 13; Pl.'s 56.1 Stmnt ¶ 13; see also Lager Decl., Ex. F). Defendant retained York Risk Services Group ("York"), a third-party administrator, to handle the claim submitted by plaintiff for the loss on January 9, 2016. (Def.'s 56.1 Stmnt ¶ 14; Pl.'s 56.1 Stmnt ¶ 14).

According to defendant, York was first notified of the claim on January 15, 2016 when the claim was opened and Robert Sargent was assigned to administer the claim. (Def.'s 56.1 Stmnt ¶ 15; see also Pl.'s 56.1 Stmnt ¶¶ 15, 16; Lager Decl., Ex. H). Sargent testified that on January 15, 2016, he made an initial evaluation of the claim by reviewing the Accord and the Policy and comparing them to determine coverage. (Def.'s 56.1 Stmnt ¶ 16; Lager Decl., Ex. H, at 24, 39-40). In his initial coverage memorandum, Sargent concluded that the Policy covered broken pipes. (Def.'s 56.1 Stmnt ¶ 17; Pl.'s 56.1 Stmnt ¶ 17; Lager Decl., Ex. I at 39-40). Defendant asserts that Sargent retained the services of a field adjuster to go to the Property and evaluate the loss and then prepare a report as to the cause of the loss. (Def.'s 56.1 Stmnt ¶ 18). Plaintiff concedes that the services provided by York included the evaluation by a "field adjuster" but plaintiff disputes the claim that Sargent "hired" the field adjuster and that the field adjuster was required to prepare a report as to "the cause of the loss." (Pl.'s 56.1 Stmnt ¶ 18).

The field adjuster assigned to the claim, Robert Herb, was hired by York, and Mr. Herb drafted a number of reports for York which Sargent relied upon in making his ultimate coverage determination as to the loss to the Property. (Def.'s 56.1 Stmnt ¶¶ 19, 20; Pl.'s 56.1 Stmnt ¶¶ 19, 20). Mr. Herb's first report, dated February 3, 2016, identified the cause of the loss as furnace failure which caused the temperature in the house to fall below freezing, causing the pipes to freeze and burst. (Def.'s 56.1 Stmnt ¶ 21; Pl.'s 56.1 Stmnt ¶ 21; Lager Decl., Ex. J). In his second report, dated March 25, 2016, Mr. Herb confirmed, after further investigation, that the

cause of the loss was that the water pipes froze and burst due to the failure of both furnaces in the house.  (Def.'s 56.1 Stmnt ¶ 22; Pl.'s 56.1 Stmnt ¶ 22; Lager Decl., Ex. K).  Also in his second report, Mr. Herb stated that "it appears that heat was not maintained in accordance with endorsement for WK CP 02 11 08 Protective Safeguards – Heat Maintained."  (Def.'s 56.1 Stmnt ¶ 23; Pl.'s 56.1 Stmnt ¶ 23; Lager Decl., Ex. K).  Mr. Herb indicated in his second report that he requested permission from the public adjuster to inspect the burst pipe and that he would also attempt to obtain the electric and gas bills to determine if the heat was properly maintained in the building.  (Def.'s 56.1 Stmnt ¶ 24; Pl.'s 56.1 Stmnt ¶ 24; Lager Decl., Ex. K).

In the third report, issued by Mr. Herb on May 23, 2016, he indicated that he was still attempting to secure the damaged pipes for inspection and he was trying to obtain the utility and heating bills.  (Def.'s 56.1 Stmnt ¶ 25; Pl.'s 56.1 Stmnt ¶ 25; Lager Decl., Ex. L).  In his fourth report, dated August 28, 2016, Mr. Herb reported that he had still been unable to secure the pipes for inspection and he had not received the utility bills for review.  (Def.'s 56.1 Stmnt ¶ 26; Pl.'s 56.1 Stmnt ¶ 26: Lager Decl., Ex. M).

On June 21, 2016, defendant sent plaintiff a declination letter, denying coverage for the claim.  (Def.'s 56.1 Stmnt ¶ 27; Pl.'s 56.1 Stmnt ¶ 27; Lager Decl., Ex. N).  The declination letter indicated that the denial of coverage was based on the Policy endorsement requiring that heat be maintained at an "ambient temperature of not less than 50 degrees Fahrenheit."[5]  (Def.'s 56.1 Stmnt ¶¶ 28, 29; Pl.'s 56.1 Stmnt ¶¶ 28, 29; Lager Decl., Ex. N).  The Policy endorsement, Protective Safeguards – Heat Maintained, Form WK CP 02 11 08 (the "Endorsement"), warns in

---

[5] Plaintiff notes that the denial letter also alleged that plaintiff was in breach of the "Vacancy" provision of the Policy, but that rationale was withdrawn by defendant at a conference before the undersigned on April 26, 2016.  (Pl.'s 56.1 Stmnt ¶ 28; see also  Def.'s 56.1 Stmnt ¶ 28 n.19).

all capital letters that "THIS ENDORSEMENT CHANGES THE POLICY – PLEASE READ IT CAREFULLY." (Lager Decl., Ex. O). It then provides:

> 1. The following is added to the COMMERCIAL PROPERTY CONDITIONS:
>
>    As a condition of this insurance, you are required to maintain an ambient temperature of not less than 50° Fahrenheit at all times throughout any building identified in the Schedule by use of a gas-fired, coal-fired, electric or similar heating system.

(Lager Decl., Ex. O ¶ 1). The Endorsement further provides that:

> 2. The following is added to the EXCLUSIONS section of [various parts of the policy]:
>
>    We will not pay for loss or damage at any building identified in the Schedule caused by or resulting from the following causes of loss, if covered under this policy, unless the ambient temperature throughout the premises at the time of loss or damage is not less than 50° Fahrenheit:
>
>    a. Sprinkler leakage;
>
>    b. Weight of snow, ice or sleet; or
>
>    c. Water damage.

(Lager Decl., Ex. O ¶ 2).

Defendant contends that the endorsement language is promulgated by the insurance industry standard organization ("ISO") and has been used since 2008. (Def.'s 56.1 Stmnt ¶ 30). Plaintiff disputes that the endorsement is identical to any ISO form and notes that, having searched LEXIS Advance which has access to all ISO forms for the country, plaintiff's counsel was unable to find such an endorsement that matches the endorsement set forth in Exhibit O to the Lager Declaration. (Pl.'s 56.1 Stmnt ¶ 30). However, the plaintiff concedes that the Policy excludes coverage for water damage resulting from pipes freezing due to a failure to maintain heat in the premises. (Pl.'s 56.1 Stmnt ¶ 31; see Def.'s 56.1 Stmnt ¶ 31).

Although the parties agree that the water damage was the result of a frozen pipe that burst (Def.'s 56.1 Stmnt ¶ 32; Pl.'s 56.1 Stmnt ¶ 32), the parties disagree as to whether the freezing was due to the failure to maintain the heat at 50 degrees.  (Compare Def.'s 56.1 Stmnt ¶ 33, with Pl.'s 56.1 Stmnt ¶ 33).  Defendant draws the conclusion that "if the pipes froze, the property could not have been maintained at 50 [degrees] Fahrenheit at all times pursuant to the terms of the protective safeguard" because "freezing does not occur unless the temperature of the pipes dropped to 32 [degrees] Fahrenheit or below."  (Def.'s 56.1 Stmnt ¶¶ 33, 34).

Plaintiff disputes this conclusion and cites the testimony of plaintiff's property manager and real estate agent, Michael Novik, who testified that he visited the Property every two to three weeks, "to make sure everything is in proper order."  (Pl.'s 56.1 Stmnt ¶ 33; Lager Decl., Ex. T at 7-8, 11, 20, 22-23).  According to the property manager's testimony, when he visited the Property, he would inspect each floor and "make sure the heat is on if it's the winter time," and that "no pipes were leaking." (Lager Decl., Ex. T at 7-8, 11, 20, 22-23).  Mr. Novik testified that he visited the Property within 30 days of the loss and made sure that the temperature was maintained at 55 degrees.  (Id.)  Thus, plaintiff contends that the pipes froze despite plaintiff's reasonable efforts to maintain the heat at 50 degrees in compliance with the endorsement.  (Pl.'s 56.1 Stmnt ¶ 33).  Plaintiff argues that even though the freezing point is 32 degrees Fahrenheit, none of the other pipes froze so this calls into question why a particular pipe froze and the others did not.  (Id.)

Defendant points out that Mr. Novik is a real estate broker, responsible for buying and selling properties for Read and for maintaining the Property.  (Def.'s 56.1 Stmnt ¶ 36; Pl.'s 56.1 Stmnt ¶ 36).  According to defendant, although Mr. Novik testified that he visited the Property every two to three weeks and that he was there in December 2015, he could not recall the

specific date that he was last at the Property prior to January 9, 2016. (Def.'s 56.1 Stmnt ¶¶ 37-39; Pl.'s 56.1 Stmnt ¶¶ 37-39). Plaintiff disagrees with the inference that defendant seeks to draw and notes that Mr. Novik "specifically testified that prior to January 9, 2016, he did observe that the furnaces were in working order." (Pl.'s 56.1 Stmnt ¶ 39).

Defendant notes that Mr. Novik never received invoices for the gas, electric or other utilities; these were handled directly by Read. (Def.'s 56.1 Stmnt ¶ 40). Plaintiff does not dispute this. (Pl.'s 56.1 Stmnt ¶ 40; Lager Decl., Ex. Q at 27-28). Although the parties dispute the extent of Mr. Novik's knowledge of the business and ownership of Read, the parties agree that he was not involved with the purchase of the insurance for the Property. (Def.'s 56.1 Stmnt ¶¶ 41-43; Pl.'s 56.1 Stmnt ¶¶ 41-43; Lager Decl., Ex. Q at 9-10, 24, 60).

During the course of discovery in this case, plaintiff disclosed heating bills for the Property for the months of October, November, and December 2015. (Def.'s 56.1 Stmnt ¶ 44; Pl.'s 56.1 Stmnt ¶ 44; Lager Decl., Ex. R). Mr. Herb reviewed the bills and concluded that they were not complete in that they did not include the bill for January 2016 when the loss occurred; therefore, they do not demonstrate that the heat was maintained. (Def.'s 56.1 Stmnt ¶ 45; Lager Decl., Ex. R; Herb Aff.[6] ¶¶ 16-18). Indeed, according to Mr. Herb, the bills provided by plaintiff show that while the gas was on in the Property in October 2015, the gas usage for November and December registered at zero. (Herb Aff. ¶¶ 16-18).

Defendant further notes that these records do not demonstrate that the heat was on at the time of the loss and that despite Mr. Herb's requests during his eight month investigation, he never received these records. (Def.'s 56.1 Stmnt ¶¶ 46, 47; Herb Aff. ¶¶ 14-15; Lager Decl.,

---

[6] Citations to "Herb Aff." refer to the Affidavit of Robert Herb, dated August 2, 2017, ECF No. 20-19.

Exs. J, K, L, M). Defendant asserts that "[t]here is no dispute that the heat was not working at the time of the loss as confirmed by the invoices reflecting that the furnace was not in working order at the time of the loss." (Def.'s 56.1 Stmnt ¶ 48; Herb Aff. ¶¶ 10-13; Lager Decl., Ex. S). Specifically, defendant has presented a copy of an invoice for payment for repairs to furnace, dated January 23, 2016. (Lager Decl., Ex. S). Defendant contends that Mr. Novik was never told at what temperature to set the thermostat and that he only learned of the loss when another broker visited the Property for a showing. (Def.'s 56.1 Stmnt ¶¶ 49-51).

Plaintiff admits that these records do not show the gas usage at the Property from December 2015 through January 2016, but plaintiff disputes that the records are "incomplete," noting that "Defendant never served any request for documents upon Plaintiff whatsoever." (Pl.'s 56.1 Stmnt ¶¶ 45, 46). Plaintiff also disputes defendant's characterization of the evidence, arguing that there is "no evidence to suggest that the furnaces at the subject premises broke down before the pipe freeze or that the heat was not working at the time." (Pl.'s 56.1 Stmnt ¶ 48; but see Pl.'s Mem. [7] at 5 (stating that "[t]here is no dispute that the cause of loss was a furnace failure, which caused the subject pipe to freeze and burst resulting in extensive water damage")). Plaintiff does concede that Mr. Novik learned of the loss from another broker and that he was not specifically instructed as to the temperature at which to set the thermostats in the Property, but he testified that he knew what was expected from prior experience with the plaintiff. (Id. ¶¶ 49-51). The parties dispute whether the claim was properly denied. (Compare Def.'s 56.1 Stmnt ¶ 52, with Pl.'s 56.1 Stmnt ¶ 52).

---

[7] Citations to "Pl.'s Mem." refer to the Memorandum of Law in Support of Plaintiff's Cross-Motion for Summary Judgment & in Opposition to Defendant's Motion for Summary Judgment, dated September 6, 2017, ECF No. 21-9.

Defendant moves for summary judgment on the only claim in plaintiff's Complaint, which is a claim for breach of contract based on defendant's failure to indemnify plaintiff for the loss sustained by a "covered peril," which plaintiff claims was insured by the defendant. (Def.'s Mem.[8] at 3; Compl.[9] ¶ 6). Plaintiff claims that although all of the conditions of the Policy had been satisfied, defendant breached the agreement and owes plaintiff damages in the amount of at least $171,167.85. (Def.'s Mem. at 3; Compl. ¶¶ 6-7). Defendant takes the position that its disclaimer of coverage was appropriate based on the unambiguous language of the Policy and the circumstances of the loss; and that there is no factual dispute that plaintiff failed to maintain the ambient temperature of not less than 50 degrees Fahrenheit. (Def.'s Mem. at 3-10; 11-12).

Plaintiff has cross-moved for summary judgment conceding that there is no dispute that the cause of loss was a furnace failure. (Pl.'s Mem. at 5; but see Pl.'s 56.1 Stmnt ¶ 48). Instead, plaintiff argues: 1) that the word "maintain" in the endorsement is undefined and ambiguous; 2) the defendant's interpretation of the endorsement/exclusion is against public policy; and 3) the undisputed facts show that plaintiff took reasonable steps to maintain the heat in the premises. (Pl.'s Mem.)

Defendant contends that the term "maintain" is unambiguous and even if it were not, plaintiff failed to take reasonable efforts to comply with the endorsement's requirement. (See generally Def.'s Opp'n[10]).

---

[8] Citations to "Def.'s Mem." refer to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated August 4, 2017, ECF No. 20-1.

[9] Citations to "Compl." refer to plaintiff's Complaint, filed on July 14, 2016, and attached as Exhibit 4 to defendant's August 16, 2016 Notice of Removal, ECF No. 1-4.

[10] Citations to "Def.'s Opp'n" refers to the Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment and in Further Support of Defendant's Motion for Summary Judgment, dated September 29, 2017, ECF No. 22-1.

<u>DISCUSSION</u>

**A. Summary Judgment Standard**

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if it might affect the outcome of a case under the governing substantive law. <u>Figueroa v. Mazza</u>, 825 F.3d 89, 98 (2d Cir. 2016) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). It is the sole province of the jury to weigh evidence, to assess the credibility of witnesses, to draw factual inferences, and to choose between conflicting versions of events. <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553–54 (2d Cir. 2005); <u>see</u> <u>Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)</u>, 574 F.3d 129, 153 (2d Cir. 2009) (explaining that "the weighing of [evidence] is a matter for the finder of fact at trial, not the prerogative of the court on a motion for summary judgment) (citation and quotation marks omitted); <u>accord</u> <u>Chiaramonte v. Animal Med. Ctr.</u>, 677 F. App'x 689, 693 (2d Cir. 2017). Thus, for purposes of summary judgment, a dispute or issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Nick's Garage, Inc. v. Progressive Cas. Ins. Co.</u>, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. <u>Nick's Garage, Inc. v. Progressive Cas. Ins. Co.</u>, 875 F.3d at 113–14 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The showing necessary to satisfy this initial burden varies depending on whether the movant would bear the burden of proof as to the particular issue at trial. If the movant would bear the burden of proof at trial, then that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." <u>Albee Tomato, Inc. v. A.B. Shalom Produce Corp.</u>, 155 F.3d 612, 618 (2d Cir. 1998); <u>see</u> 10A Charles

A. Wright *et al.*, Federal Practice & Procedure § 2727.1 (4th ed.) (observing that to satisfy its burden of production on summary judgment, a movant that bears the burden of proof at trial "must lay out the elements of its claim, citing the facts it believes supports those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing").  If, by contrast, the burden of proof at trial would fall on the nonmoving party, the movant generally may satisfy its burden by pointing to the absence of evidence on an essential element of the nonmovant's claim, Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. at 322–23), or by submitting evidence that "negates an essential element of the nonmoving party's claim."  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d at 114 (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

Once the moving party discharges its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008); see also Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir. 1996) (explaining that a nonmovant "may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial").  The party resisting summary judgment may not rely on mere conclusory allegations or denials, such as those in the pleadings, or on unsubstantiated speculation.  Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 428 (2d Cir. 2001).  Moreover, "there must be more than a scintilla of evidence and more than some metaphysical doubt as to the material facts."  Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990) (citations and quotations omitted).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)) (internal quotation marks omitted). Crucially, however, in determining whether there exist genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)).

The same standard applies even where, as here, the parties have filed cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the nonmoving party." United Indus. Corp. v. IFTE PLC, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). Although, by virtue of the cross-motions, both parties seek summary judgment, neither is barred from asserting that issues of fact preclude judgment as a matter of law in favor of the opposing party. Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1991). Similarly, the filing of cross-motions for summary judgment does not require the court to grant judgment as a matter of law for one party or the other. Id.

## B. Interpreting Insurance Contracts Under New York Law

The Court's jurisdiction over this case is premised on diversity of the parties, and the Court therefore applies the forum state's substantive law and federal procedural law. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996); see also Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (observing that the Erie doctrine extends

to "preliminary choice-of-law questions").  The initial interpretation of a contract, including the determination of a party's rights and obligations, is a matter of law to be decided by the Court.  E.g., White v. Continental Cas. Co., 9 N.Y.3d 264, 267, 878 N.E.2d 1019, 1021, 848 N.Y.S.2d 603, 605 (2007); Morgan Stanley Grp., Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000).

"Under New York law, insurance policies are interpreted according to general rules of contract interpretation."  Olin Corp. v. American Home Assurance Co., 704 F.3d 89, 98 (2d Cir. 2012).  "An insurance contract must be interpreted so that a clear and unambiguous policy provision is given its plain and ordinary meaning."  Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 90 (2d Cir. 2009) (citing U.S. Fid. & Guar. Co. v. Annunziata, 67 N.Y.2d 229, 232, 492 N.E.2d 1206, 1207, 501 N.Y.S.2d 790, 791 (1986)); see Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., 773 F.3d 110, 113–14 (2d Cir. 2014) (explaining that "[w]hen interpreting a contract, [a court's] primary objective is to give effect to the intent of the parties as revealed by the language of their agreement") (citation and quotation marks omitted); Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 237 (2d Cir. 2002) (observing that "all language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes") (citation and quotation marks omitted).  Moreover, a contract should be construed in a way that gives full meaning and effect to all of its provisions.  Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., 773 F.3d at 114.  However, any ambiguities found in the contract must be resolved in favor of the insured.  Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 600 F.3d 190, 201 (2d Cir. 2010); accord Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 13 A.D.3d 599, 599, 788 N.Y.S.2d 142, 144 (2d Dep't 2004) (noting that "if the

language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer") (quoting <u>Westview Assocs. v. Guaranty Nat'l Ins. Co.</u>, 95 N.Y.2d 334, 340, 740 N.E.2d 220, 223, 717 N.Y.S.2d 75, 78 (2000)).  This rule of construction—known as *contra proferentem*—only applies once the court identifies an ambiguity.  <u>See</u> <u>Wallace v. 600 Partners Co.</u>, 86 N.Y.2d 543, 548, 658 N.E.2d 715, 717, 634 N.Y.S.2d 669, 671 (1995) (explaining that "[t]he rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity").

"An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" <u>Morgan Stanley Grp. Inc. v. New England Ins. Co.</u>, 225 F.3d 270, 275 (2d Cir. 2000) (quoting <u>Lightfoot v. Union Carbide Corp.</u>, 110 F.3d 898, 906 (2d Cir. 1997)).  By contrast, "ambiguity does not exist simply because the parties urge different interpretations."  <u>Hugo Boss Fashions, Inc. v. Federal Ins. Co.</u>, 252 F.3d 608, 616 (2d Cir. 2001) (citation and quotation marks omitted).  The starting point in any contract analysis is the plain language of the contract itself, without reference to extrinsic evidence.  <u>Id.</u> at 617; <u>see</u> <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990) (remarking that "[a] familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" and explaining that the rule "imparts stability to commercial transactions").

**C. The Protective Safeguards Endorsement**

The parties dispute the proper interpretation of the Protective Safeguards – Heat Maintained Endorsement (the "Endorsement").  The Endorsement consists of two distinct yet related provisions.  The first imposes a duty on the insured and a condition precedent to coverage by requiring the insured "to maintain an ambient temperature of not less than 50° Fahrenheit at all times throughout any [insured] building."  (See Lager Decl., Ex. O ¶ 1).  The proper interpretation of this provision is the primary point of contention between the parties.  The second provision conditions the insurer's performance under the insurance contract on the existence of an ambient temperature not less than fifty degrees Fahrenheit.

1. Definitions of "Maintain"

The Court starts, as it must, by examining the plain meaning of the language within the four corners of the contract.  Thus, "it is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 120 (2d Cir. 2011) (quoting Essex Ins. Co. v. Laruccia Constr., Inc., 71 A.D.3d 818, 819, 898 N.Y.S.2d 558, 599 (2d Dep't 2010)); see also R/S Assocs. v. New York Job Dev. Auth., 98 N.Y.2d 29, 33, 771 N.E.2d 240, 242, 744 N.Y.S.2d 358, 360 (2002) (consulting the Oxford English Dictionary to determine the plain and ordinary meaning of a contract term).

The word "maintain" has many meanings.  Webster's New World Dictionary lists six, including:  "to keep or keep up; continue in or with;" "to keep in existence or continuance;" "to keep in a certain condition or position, especially of efficiency, good repair;" and "to support by providing means of existence."  *Maintain*, Webster's New World Dictionary (3d college ed. 1988).  Merriam-Webster Unabridged also provides six definitions, including:  "to keep in a state

of repair, efficiency, or validity:  preserve from failure or decline;" and to "sustain."  *Maintain*,

Merriam-Webster Unabridged, http://unabridged.merriam-webster.com/unabridged/maintain

(last visited Mar. 20, 2018).  Black's Law Dictionary, like the aforementioned dictionaries,

provides six definitions, of which three are potentially relevant here:  "to continue (something);"

"to care for (property) for purposes of operational productivity or appearance;" and "to engage in

general repair and upkeep."  *Maintain*, Black's Law Dictionary (9th ed. 2009).

The Oxford English Dictionary, unsurprisingly, sets forth an even more exhaustive list

that includes at least sixteen definitions (excluding sub-parts), including:  "to keep up, preserve,

cause to continue in being (a state of things, a condition, an activity, etc.);" "to guard from loss

or deterioration;" and "to cause to continue in a specified state, relation, or position, or at a

specified level or number,"[11] among other definitions.  *Maintain*, Oxford English Dictionary (3d

ed. 2000).

2. Sentence Level Context

That there are many definitions of the word "maintain" does not mean its use will always

result in ambiguity.  When considered in isolation and without reference to the context, almost

any word can be ambiguous, which is why courts must review the context in which a term

appears, both at the granular level of the sentence and the macro level of the contract as a whole,

to determine whether it is ambiguous.  See Morgan Stanley Grp. Inc. v. New England Ins. Co.,

225 F.3d at 275.  The construction of the sentence in which a word is used, the subject of the

---

[11] The attestations of usage appended to this definition are particularly relevant to the dispute in this case and support the defendant's proposed definition.  For example, one reads: "A chimney-flue passing through the wall at no great distance had no doubt conducted *to maintain the air in the cupboard at an equable temperature*."  (emphasis added).  Another is:  "The population is deliberately maintained at twenty thousand[.]"

sentence or section of the contract, and the purpose of the contract as a whole all provide

important context that can narrow the definitions that might apply and can render a word or

phrase unambiguous.

"Maintain" is a transitive verb, and therefore always takes a direct object.  In this case, its

object is the phrase "ambient temperature."  Moreover, the direct object is not just "an ambient

temperature," but also includes the prepositional phrase that modifies it, so the actual object of

the verb "maintain" is "an ambient temperature of not less than 50° Fahrenheit."  The direct

object taken by "maintain" in the Endorsement thus limits the definitions that would make sense

and would thus be reasonable.

For example, plaintiff proffers two definitions that it believes are reasonable.  First, it

contends that "maintain" means "to keep (**a building**, machine, or road) in good condition by

checking or repairing it regularly."  (Pl.'s Mem. at 8 (emphasis original)).  As the bold emphasis

supplied by plaintiff suggests, this definition would make sense if "building" were the direct

object of the verb "maintain," but that is not the case in the Endorsement.  The actual direct

object here is "ambient temperature," which emphatically is not a building, machine, or road and

is not of a similar nature.  Plaintiff's first proposed definition in fact would create even more

uncertainty:  What does it mean to keep an ambient temperature of not less than 50° Fahrenheit

in good condition?  How does one repair an ambient temperature?

Plaintiff's second definition is:  "acts of repair and other **acts to prevent a decline**, lapse

or cessation from existing state or condition."  (Pl.'s Mem. at 8 (emphasis original)).  This

appears to define a noun, not a verb.  Plaintiff asserts that the definition comes from the Fifth

Edition of Black's Law Dictionary, and the Court therefore assumes plaintiff meant to use the

comparable definition of the verb "maintain," which the Ninth Edition lists as:  "To care for

17

(property) for purposes of operational productivity or appearance." *Maintain*, <u>Black's Law Dictionary</u> (9th ed. 2009). This definition does not make sense in the context of the sentence either. The ambient indoor temperature is not itself property, and it makes no sense to care for a temperature.

There are, however, definitions from the same sources relied on by plaintiff that do make sense when "ambient temperature" is the direct object. For example, the seventh definition from the Oxford English Dictionary would fit: "To cause to continue in a specified state, relation, or position, or at a specified level or number [an ambient temperature of not less than 50° Fahrenheit]." The eighth definition might also work: "To continue in, preserve, retain [an ambient temperature of not less than 50° Fahrenheit] in spite of disturbing influences." The first definition from Black's Law Dictionary would also make sense: "To continue [an ambient temperature of not less than 50° Fahrenheit] [in existence]." Although not cited by plaintiff, the first two definitions from Webster's New World Dictionary also fit the context of the sentence: "to keep or keep up [an ambient temperature of not less than 50° Fahrenheit]" or "to keep in existence or continuance [an ambient temperature of not less than 50° Fahrenheit]." Such definitions have one thing in common: each would impose absolute liability on the insured for any of the specified losses if the temperature should fall below fifty degrees Fahrenheit.

Plaintiff argues that the Court should read into the plain language of the Endorsement a "reasonable care" standard, under which the insured would satisfy the condition precedent to coverage so long as it exercised due diligence or best efforts to ensure that the temperature in the premises remained above 50 degrees Fahrenheit. (<u>See</u> Pl.'s Mem. at 8). That argument must be rejected.

The term plaintiff seeks to add—that the insured satisfies the condition precedent to

coverage so long as it exercised due diligence or reasonable care to keep the temperature above 50 degrees, which plaintiff contends is satisfied by "check[ing] regularly for compliance," (Pl.'s Mem. at 10)—is fundamentally at odds with the plain language of the Endorsement.  See, e.g., White v. Continental Cas. Co., 9 N.Y.3d at 267, 878 N.E.2d at 1021, 848 N.Y.S.2d at 605 (explaining the fundamental precept that "a court is not free to alter the contract" absent ambiguity).  The word "maintain" is modified by the phrase "at all times," which is not susceptible to plaintiff's proposed interpretation.  Plaintiff contends that the alternative to its reading would require "the insured to constantly monitor a vacant building 24-hours a day, 7-days a week" lest the temperature drop below 50 degrees, thereby precluding certain coverage under the policy.  (Pl.'s Mem. at 10).  Plaintiff thus concedes that the phrase "at all times" modifies the word "maintain."  (See id.)

As such, the language appears to be unambiguous.  Plaintiff is incorrect, however, that the terms of the policy require the "insured to constantly monitor a vacant building."  (Id.) Under the plain language of the Endorsement, it is irrelevant whether the insured monitors the temperature; instead, the insured must keep the temperature in the vacant building at or above fifty degrees "at all times"—i.e., "24-hours a day, 7-days a week" (Pl.'s Mem. at 10)—for the insurer to be obligated to cover certain kinds of losses.  The language makes it plain that the existence of a temperature at or above fifty degrees, not the insured's efforts or attempts to obtain the existence of that condition, determines whether or not there will be coverage.

It is thus plain that any insured reading the first part of the Endorsement—particularly a sophisticated business seeking to insure 362 properties, such as the plaintiff—would understand the following to impose an absolute obligation to ensure that the temperature in the insured premises is always at or above 50 degrees Fahrenheit if the policy is to provide coverage for

certain kinds of losses:  "As a condition of this insurance, you are required to maintain an ambient temperature of not less than 50° Fahrenheit at all times throughout any [covered] building[.]"  (Lager Decl., Ex. O).

3. <u>Context of the Protective Safeguards—Heat Maintained Endorsement</u>

Although the parties focus on the first provision of the Endorsement, the second provision, which does not use the word "maintain," nonetheless provides context in which to interpret the first.  The second provision conditions the insurer's performance under the insurance contract exclusively on the existence of an ambient temperature throughout the premises of not less than 50 degrees Fahrenheit at the time of loss.  (<u>See</u> Lager Decl., Ex. O ¶ 2). The insurer's performance is not contingent on the efforts of the insured or the reasons the condition does not exist.  (<u>See id.</u>)  Moreover, neither party has argued that this provision defining the condition under which the insurer is required to perform under the contract is ambiguous.

Even if it were possible to discern an ambiguity in the duty imposed on the insured under the first part of the Endorsement, when that provision is read in conjunction with the language set out in the second part, which unequivocally conditions the insurer's performance on the existence of a temperature at or above fifty degrees, it is unreasonable to interpret the first provision as imposing anything less than an absolute duty on the insured.  Moreover, the insurer has adduced evidence that a policy with this particular exclusion results in a significantly discounted premium based on the resulting different allocation of risk between insured and

insurer.  (See, e.g., Hill Aff. ¶¶ 14-15, Sept. 29, 2017, ECF No. 22-2);[12] see 5 Steven Plitt *et al.*,

Couch on Insurance § 69:1 (3d ed., Dec. 2017 update) (explaining that "[t]he amount of the

premium varies in proportion to the risk assumed" by the insurer).  The economic realities of the

policy chosen by the plaintiff thus confirm that the policy means what it says and that plaintiff

agreed to this provision despite its current claim that the provision is unfair.

4.  Other Cases

The cases cited by the plaintiff do not alter the analysis set forth above.  All are

distinguishable and none involve the precise language at issue in this case.  Many of the cases

involve protective safeguards endorsements in which the object of the verb "maintain" is a

physical device.  See, e.g., Scottsdale Ins. Co. v. Logansport Gaming, LLC, 556 F. App'x 356,

357–58 (5th Cir. 2014) (contract required the insured "to maintain [fire extinguishers and ansul

system] . . . in complete working order," and thus there was no coverage where the system did

not work on the date of loss); Breton LLC v. Graphic Arts Mut. Ins. Co., 446 F. App'x 598, 600–

03 (4th Cir. 2011) (policy required insured "to maintain [sprinkler system] in complete working

order").  Some of the cited cases contain endorsements which explicitly require the insured to

---

[12] At the hearing on these cross-motions, plaintiff's counsel argued that he has "no evidence to suggest that [plaintiff] was given a lower premium because the reasonable diligence was removed from this provision. There is nothing in the record."  (Tr. at 19:3-6).  However, in her Affidavit, Melissa Hill, the defendant's Chief Resolution Officer, explains, under oath, that:

> the premiums for this policy are significantly lower as a result of the inclusion of the Protective Safeguard endorsement within the terms of the policy.  This policy and endorsement are negotiated for by the insured and as a result, although more stringent in the requirements of the insured, the insured pays reduced premium as a result.

(Hill Aff. ¶ 14).  She further explains that "as a result of the higher care the insured is to take, they are rewarded with a lower premium."  (Id. ¶ 15).  According to Ms. Hill, this arrangement is not contrary to public policy, but instead is "the entire model upon which the insurance industry functions."  (Id.)

use due diligence or reasonable care to "maintain" a system or condition.  See, e.g., Charles

Stores, Inc. v. Aetna Ins. Co., 428 F.2d 989, 992 (5th Cir. 1970) (insured was required to

"maintain so far as is within his control [an automatic sprinkler system and fire alarm]" and there

existed a factual dispute as to whether the systems were operational on the date of loss); Board of

Ed. of Charles Cty. v. St. Paul Fire & Marine Ins. Co., 420 F. Supp. 491, 492–93 (D. Md. 1975),

aff'd, 544 F.2d 751 (4th Cir. 1976) (policy required that "due diligence shall be used by the

insured to maintain [the sprinkler system and water supply therefor] in complete working order,"

and court found plaintiff failed to use due diligence as a matter of law).  The two cases cited by

plaintiff in which the insured was required to maintain the heat in a building in order to recover

for damage due to frozen pipes involved policies that explicitly used the language "reasonable

care."  See Gallo v. Midstate Mut. Ins. Co., 45 A.D.3d 1492, 1493, 845 N.Y.S.2d 657, 658 (4th

Dep't 2007) (policy covered frozen plumbing only if the insured "used reasonable care . . . to

maintain heat in the building"); McCabe v. Allstate Ins. Co., 260 A.D.2d 850, 851, 688 N.Y.S.2d

764, 766–67 (3d Dep't 1999) (policy would not cover damage from frozen pipes unless the

insured "used reasonable care to maintain heat in the building structure or shut off the water

supply," and whether orally contracting for automatic fuel delivery constituted reasonable care

under the policy was a question for the jury).

Not only are plaintiff's cases unavailing, but the Court has located authority that supports

defendant's interpretation of the policy.  In Convention Plaza III, LLC v. Seneca Specialty

Insurance Co., a policy endorsement "state[d] that loss caused by leaks or flows of water or other

liquids from building systems caused by or resulting from freezing is excluded 'unless . . . you

[the insured] maintain heat in the building or structure at a minimum of 55 degrees Fahrenheit.'"

47 A.D.3d 692, 693, 48 N.Y.S.3d 357, 358 (1st Dep't 2017).  The insurer submitted expert

affidavits demonstrating that the pipes froze because the HVAC units were turned off and the baseboard heaters could not have maintained a minimum temperature of 55 degrees Fahrenheit based on the documented electrical consumption. The insured submitted an affidavit stating that it had hired a person to check the premises on a regular interval and that he had never observed a change in temperature. After considering the affidavits, the First Department reversed the trial court's decision and granted summary judgment in favor of the insurer on the basis that the insured failed to maintain the required internal temperature. Id. At no point did the court suggest that use of the term "maintain" was ambiguous or that the endorsement contravened public policy.

Courts outside of New York have also reached the same conclusion that "maintain" is not ambiguous in this context. For example, applying Michigan law, the court in 455 Companies, LLC v. Landmark American Insurance Co. was confronted with a similar protective safeguards endorsement. No. 16 CV 10034, 2017 WL 3215197, at *1–2 (E.D. Mich. July 28, 2017). The language in the policy itself, before considering the endorsement, provided coverage for water losses caused by freezing so long as "[y]ou [the insured] do your best to maintain heat in the building[.]" Id. at *1. The protective safeguards endorsement, however, required that "heat [be] maintained at 55 degrees." Id. The court concluded that the endorsement superseded the original policy language and that there was no ambiguity in the endorsement's use of the word "maintain." See id. at *5–6. Under the terms of the endorsement, the court explained, "[c]overage is conditioned on maintaining heat at (presumably at least) 55 degrees. Losses caused by water damage are excluded to the extent that Plaintiff failed to maintain the heat at 55 degrees prior to the loss." Id. at *6. Thus, the court held that "if . . . pipes froze and burst because Plaintiff failed to keep the building above 55 degrees, the exclusion applies and the

condition is unsatisfied regardless of whether Plaintiff used 'best efforts' to maintain the heat."
Id.

     5.   The Terms of the Endorsement are Not Ambiguous

For all of the foregoing reasons, the Court concludes that the terms of the Endorsement are not ambiguous. The meaning of the term "maintain" is unambiguous as used in the first paragraph of the Endorsement, which clearly imposes a duty on the insured to keep the ambient temperature throughout any covered building at or above 50 degrees Fahrenheit "at all times" and which conditions coverage on the insured's satisfying that duty. The second paragraph expressly and unconditionally excludes coverage for sprinkler leakage, weight of snow, or water damage if the temperature was less than fifty degrees Fahrenheit for any reason at the time of the loss, regardless of the insured's efforts to comply with the condition.

**D. Plaintiff's Public Policy Argument**

Citing only to the Restatement (Second) of Contracts § 178, plaintiff argues that the Endorsement is unenforceable on the grounds of public policy. (See Pl.'s Mem. at 11-12).

"There is no magic formula for determining when a contract—or a particular provision of a contract—is void as against public policy." SI Venture Holdings, LLC v. Catlin Specialty Ins., 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015). The New York Court of Appeals has explained that:

> [W]hen statutes and Insurance Department regulations are silent, [courts] are reluctant to inhibit freedom of contract by finding insurance policy clauses violative of public policy. See Joseph R. Loring & Assocs. v. Continental Cas. Co., 56 N.Y.2d 848, 850, 453 N.Y.S.2d 169, 438 N.E.2d 875 (1982); Miller v. Continental Ins. Co., 40 N.Y.2d 675, 679, 389 N.Y.S.2d 565, 358 N.E.2d 258 (1976).

Slayko v. Security Mut. Ins. Co., 98 N.Y.2d 289, 295, 774 N.E.2d 208, 211–12, 746 N.Y.S.2d 444, 447–48 (2002). Thus, in New York, insurers are generally free to negotiate coverage terms

so long as the terms do not violate a statute or a regulation issued by the Insurance Department. See 720-730 Fort Washington Ave. Owners Corp. v. Utica First Ins. Co., 893 N.Y.S.2d 426, 431, 26 Misc. 3d 503, 510 (Sup. Ct. 2009) (explaining that "[i]nsurers, therefore, are prohibited from limiting their contractual liability *only* as to statutorily mandated coverage") (emphasis in original); accord Pfoh v. Elec. Ins. Co., 14 A.D.3d 777, 779, 788 N.Y.S.2d 441, 443 (3d Dep't 2005).

This reluctance to find insurance policy clauses violative of public policy results from the strong tradition of freedom of contract that "is deeply rooted in [New York's] public policy." J.P. Morgan Secs. Inc. v. Vigilant Ins. Co., 21 N.Y.3d 324, 334, 992 N.E.2d 1076, 1081, 970 N.Y.S.2d 733, 738 (2013). Indeed, at least one court in New York has held that "[t]he issuance of [a] worthless policy, although indirectly an impediment to the achievement of the remedial reforms enacted, is not directly violative of the core objective and declared public policy of [the statute at issue]" and was therefore enforceable. 720-730 Fort Washington Ave. Owners Corp. v. Utica First Ins. Co., 893 N.Y.S.2d at 433, 26 Misc. 3d at 511.

Plaintiff has pointed to no case in which a policy provision such as that contained in the Endorsement was deemed unenforceable on public policy grounds, nor has the Court been able to locate one. Moreover, the plaintiff does not point to a single statute or regulation that it claims is violated by the Endorsement. See Slayko v. Security Mut. Ins. Co., 98 N.Y.2d at 295, 774 N.E.2d at 212, 746 N.Y.S.2d at 448.

By contrast, at least one New York state court has enforced a provision almost identical to the one at issue here, without any suggestion that such a provision contravenes public policy. See Convention Plaza III, LLC v. Seneca Specialty Insurance Co., 47 A.D.3d at 693, 48 N.Y.S.3d at 358. Similarly, courts outside New York have enforced similar provisions without

suggesting that such a provision might violate public policy.  See generally 455 Companies, LLC v. Landmark Am. Ins. Co., 2017 WL 3215197.  These cases support the defendant's argument that there is no reason for this Court to depart from the usual rule that the "parties to an insurance arrangement may generally contract as they wish and the courts will enforce their agreements without passing on the substance of them."  J.P. Morgan Secs. Inc. v. Vigilant Ins. Co., 21 N.Y.3d at 334, 992 N.E.2d at 1081, 970 N.Y.S.2d at 738 (citation and quotation marks omitted).

Moreover, even if it were appropriate to consider abstract notions of fairness rather than the specific policies established by the state legislature, there is nothing fundamentally unfair in enforcing the contract as written.  Plaintiff is a sophisticated organization that purchased a policy of insurance to cover 362 properties, some of which were vacant.  The premium paid by the plaintiff presumably reflected the policy's allocation of risk between insured and insurer; thus, because the Endorsement allocated less risk to the defendant as the insurer, the plaintiff paid a smaller premium than it would have been required to pay for a policy that allocated more risk to the insurer by requiring plaintiff only to exercise due diligence.  (See, e.g., Hill Aff. ¶¶ 14-15). Thus, the "rule applicable here is *caveat emptor*—let the buyer beware."  720-730 Fort Washington Ave. Owners Corp. v. Utica First Ins. Co., 893 N.Y.S.2d at 433, 26 Misc. 3d at 513. Plaintiff had the opportunity to reject the policy containing the Endorsement if it found the allocation of risk unacceptable; "[h]aving failed to do so, [it] left [itself] exposed[,] and there is no public policy mandate which the Court can utilize to rescue" the plaintiff from the bargain it struck.  Id.

The Court therefore concludes that the Endorsement at issue in this litigation is not contrary to public policy and the Court must therefore enforce the contract as written.

### E. Summary Judgment

Having concluded that the terms of the Endorsement are unambiguous and do not violate public policy, the Court must now apply the summary judgment standard to determine whether there is a genuine dispute of material fact that would preclude entry of judgment as a matter of law.

Both parties agree that the water damage for which plaintiff seeks coverage was the result of a pipe that froze and then burst. (See Def.'s 56.1 Stmnt ¶¶ 32–33; Pl.'s 56.1 Stmnt ¶¶ 32–33). The parties also do not dispute that the freezing point of water is 32 degrees Fahrenheit. (See Def.'s 56.1 Stmnt ¶ 34; Pl.'s 56.1 Stmnt ¶ 34).

Plaintiff asserts, without citing to any evidence or any part of the record, that "there is no evidence that any other pipes froze," which "call[s] into question how the subject pipe was caused to freeze, as well as whether any other areas of the subject premises experienced below freezing temperatures." (Pl.'s 56.1 Stmnt ¶ 34). Plaintiff also attempts to dispute that the temperature at the property was less than fifty degrees at the time of the loss by offering testimony from Michael Novik, plaintiff's property manager, that he normally would visit the property every two to three weeks and would make sure the heat was on when he visited. (See Pl.'s 56.1 Stmnt ¶ 33). Plaintiff offers this testimony as evidence of its "reasonable efforts" to keep the temperature at fifty degrees (id.), which the Court has already explained is insufficient to satisfy the requirement that the temperature be maintained at fifty degrees or above under the terms of the Endorsement.

Coverage under the policy is conditioned on the existence of an ambient temperature at or above fifty degrees Fahrenheit throughout the building or the premises at the time of a loss. Whether there were other areas in the building where pipes did not freeze does not affect whether the policy affords coverage for the loss. It also is irrelevant that the property manager visited the

property every two to three weeks, since he admittedly was not present on the day of the loss or the days leading up to the loss, and his presence would not affect the temperature in the building. Such speculation is insufficient to resist summary judgment.  See Fujitsu Ltd. V. Federal Exp. Corp., 247 F.3d at 428.  The factual disputes plaintiff attempts to raise are thus not material because they would not affect whether or not the loss is covered.  See Figueroa v. Mazza, 825 F.3d 89, 98 (2d Cir. 2016).

Defendant has introduced evidence that "the property could not have been 50° Fahrenheit [or more] at the time of the loss as freezing does not occur unless the temperature of the pipes dropped to 32° Fahrenheit or below." (Def.'s 56.1 Stmnt ¶ 34).  Although plaintiff admits that the freezing point of water is 32 degrees (Pl.'s 56.1 Stmnt ¶ 34), and that the pipe froze and burst (e.g., Pl.'s 56.1 Stmnt ¶ 32, 33), plaintiff does not clearly admit that the temperature in the premises was less than 50 degrees at the time of the loss or that freezing does not occur unless the temperature of the pipes drops to 32 degrees.  (See Pl.'s 56.1 Stmnt ¶ 34).  Moreover, plaintiff has admitted that pipes freeze when the temperature reaches 32 degrees, and has pointed to no evidence from which a reasonable jury could find that the ambient temperature in the building was at or above fifty degrees when the pipes froze.  Thus, plaintiff's response does not controvert the defendant's assertion and evidence, and plaintiff has offered no contrary evidence that might call into question defendant's proof on this point.  Defendant's evidence that pipes cannot freeze if the temperature in the building is at or above fifty degrees Fahrenheit is undisputed.[13]

---

[13] Paragraph 33 and 34 of defendant's Rule 56.1 Statement could also appropriately be deemed admitted because they are not "specifically controverted" by plaintiff's counterstatement; instead, plaintiff countered with non-responsive assertions, many of which were unsupported by citations to admissible evidence.  See L. Civ. R. 56.1(c), (d).

It is undisputed that the pipes in the insured premises froze, resulting in water damage. The defendant has presented evidence that the ambient temperature throughout the insured premises was not at least fifty degrees Fahrenheit at the time of the loss, and the plaintiff has not come forward with evidence sufficient to create a genuine dispute as to that fact. Thus, the insurance contract does not provide coverage for the loss, and the defendant is entitled to judgment as a matter of law.

<u>CONCLUSION</u>

For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      March 30, 2018

                                        /s/ Cheryl L. Pollak
                                        Cheryl L. Pollak
                                        United States Magistrate Judge
                                        Eastern District of New York